Next case is United States versus Patton So, time will be split between you and Mr. Moyers.That's correct, your honor. So time will be split between you and Mr. Cox, is that right? That's correct. All right, very well. Go ahead, sir. I'd like to reserve three minutes of my time for rebuttal after the government. Very well. That's granted. Go ahead, sir. May it please the court, my name is Peter Moyers and I represent Mr. Gary Lee in this case. The court should remand this case to the district court for an evidentiary hearing on Mr. Lee's Sixth Amendment claims because the district court, when it failed to conclude, as it must under Section 2255B of Title 18, that the petition, the records, and files conclusively showed that Mr. Lee was not entitled to relief. Indeed, the district court itself, on page 9 of the appendix in footnote 6, noted that one could reasonably infer from the record that the courtroom was closed, therefore identified an evidentiary issue and didn't have a hearing. That was error under the federal statute and requires remand. Tell me how you overcome Lee's failure to raise effective assistance of appellate counsel. Our argument is, Your Honor, any reasonable, reasonably effective appellate counsel would look at the record and see that there was at least a courtroom closure for the individual defense attorney. Structural error, like a courtroom closure, is the home run of appellate defense practice. It's similar to when the government has default or waiver. It's terrific. It's the first thing that the appellate criminal defense lawyer looks through the record for because you don't have to show prejudice. So we should acknowledge this is the fastball down the middle that's so slow that you've got to hit it. It's the first, I can say as an officer of the court, Your Honor, this is the first thing that we look for through all the transcripts because it is, it's one that carries the least of burden for the appellate criminal defense attorney. Let's not say that we don't look for other trial errors, but the first thing we're looking for is those structural errors in that category that entitle the defendant to automatic reversal. And so our view is that any minimally competent criminal, appellate criminal defense attorney would look through this record, see that there was at least a closure for the individual voir dire, and say, I've got to do a little investigation about this. I've got to look at- But the individual voir dire was in the jury room, right? That's correct, Your Honor. And Bonsall has held that that is okay. I would dispute that that was what Bonsall said in particular. What Bonsall was most concerned about was the fact that the defendant there did not bring up at the trial level, his, in effect, did not bring up the public trial claim and then waited sort of strategically, if you will, to spring it on the appellate court for, in hopes of getting a structural error, an automatic reversal. The court couldn't countenance that. No, but when you say automatic reversal, obviously, that part of the problem here, in other words, the individual voir dire in the jury room, obviously was known to trial counsel, right, first, number one. And then number two, trial counsel didn't object to that. Doesn't that mean it's waived? Well, first of all, we don't- In the case as a whole, that can be waived, right, the closure? The counsel can't waive a closure, we would argue, on if the client disputes it. I thought there are cases that say, you know, it can be waived if there's no objection. It can with the defendant's consent. But when we're dealing with that, those sorts of structural errors, what we're talking about here are the right to a jury trial at all, the right to represent yourself. Let's see here, you know, denial of right to pay counsel of one's choice. Well, all I'm saying is, if it's clear on the record to appellate counsel that trial counsel knew about it, didn't object, it's not a slam dunk, is it? Well- Is it a slam dunk structural error? I think what the record never discusses how they get to individual voir dire. All we have is a statement from the court suggesting, OK, now we're going to move over to individual voir dire. But it's obvious that the trial counsel had to know about it unless the counsel was excluded from voir dire. He had to know that it was happening. And then there's a reason for the, you know, for trial counsel objection if he didn't. Maybe there's ineffective assistance at trial. But I mean, all those facts, to me, seem to indicate it's not, you know, a slam dunk appellate issue. Well, what we're talking about is we don't know the facts then. We don't know what the attorney thought. We don't know whether we have we do know that the client did want to have his family present for all of the proceedings in public. We do know that. And to the extent there are open issues on this matter, the court should have held a hearing. Remember, the standard just to get the evidentiary hearing in a 2255 case is a standard that's got to conclusively show you will never, ever get relief. And there are just too many factual issues open here for the judge to make that kind of conclusion without an evidentiary hearing. On the question of individual voir dire, I have been a district judge. And if you don't go into the jury room, you do it up at the bench so that no one in the courtroom can hear what's going on. So you might as well be in another room. In fact, I was called for jury duty in D.C. not long ago in the Superior Court. And when I was called up to the bench, they put on white noise so that no one could hear. So that that that dialogue is not something that the people in the courtroom are going to hear, whether it happens at the bench or whether it happens in the jury room. Well, I would argue that there's an important distinction there. The public can still view and observe what's going on at sidebar. They may not necessarily need to hear what private information the juror may be sharing about a medical appointment or that sort of thing. But they can observe the lawyers doing their jobs and asking questions, the judge doing her job and asking questions, maybe even the defendant asking questions of the juror. So there is some transparency there that's very different from going behind closed doors and then coming out with a decision. And I think what we have to remember here is that transparency and confidence go hand in hand. We don't expect our institutions to be. Infallible, but we do not accept decisions that come from behind closed doors. I did not make the jury panel. All right, thank you. Good morning, please, the court. I'm Roger Cox. I represent Mr. Omari Patton. I'm just discontinuing the line of discussion that Mr. Moyers was making as far as going back into the jury room. Why didn't counsel object? I don't think it occurred to them. It's clearly didn't. They didn't turn a brain cell about the public trial. Right. I think Judge Tashima's point is, given that fact, saying that appellate counsel should have seen this issue so clearly doesn't really jive. I think that was more his point. Well, it clearly wasn't as obvious as it should have been because appellate counsel didn't do anything with it. They ignored it altogether. And it is kind of scary that, you know, Waller and Press Enterprise decided in 1984. And yet it just kind of has escaped everybody's notice since that, you know, in many, many cases. We get the Owens case in the First Circuit. This case, there are others floating out there until Presley came along to remind us of the importance of it. You know, I think in this case and probably in others, lawyers and judges have tended to overlook it. So then in your view, whether whether it's done, whether the voir dire is done in sight of the public behind closed doors at sidebar is really not relevant because since we're talking about structural error, wherever it occurs, if the public is excluded in any way, the constitutional violation exists. That's right, Your Honor. I mean, that's the basic problem. We have to uphold the sanctity of the importance of the public trial right. And it's too easy to say, well, it's more convenient to take it back in the jury room for there. It's more convenient. Waller doesn't give us that choice. This must be an overriding interest. In your view, is there a difference between public closure that occurs with the imprimatur of the judge as opposed to the intercession of, say, a court security officer? No, Your Honor, there's no logical or rational difference between the two scenarios. It doesn't matter whether the judge orders it, whether the judge knows about it. If it occurs is when the problem occurs. Public trial right is violated. If it's violated, it doesn't matter how it gets violated. It either is or it isn't. And in this case, there's sufficient evidence that it was in two ways. One was the exclusion of particular members of the families of the two defendants by the marshals, which the judge claims she doesn't know about at all. And the moving everything back into the jury room away from public view. When your adversary gets up, I would presume that one of the things that he may talk about is the triviality exception. Well, yes, Your Honor. Of course, he's relied a great deal upon the Green case and non-precedential opinion of this court. But in the Green, Green was completely different from this. Green is a case where the public was excluded for only a very short period of time, a period of minutes. The judge was not on the bench at the time. There were no proceedings going on. So there was nothing for the public to view had they been let in. Our case is much different. It appears to have infected the entire first day of trial, the entire wide year proceedings. We have no evidence that anybody was allowed in the courtroom from the public or from the relatives as to Mr. Patton and Mr. Lee. The total tally by my count is somewhere at 10 or 11. Is that right? 10 or 8 that you've submitted evidence that is both appellants of about 10 or 11 people being excluded. Is that right? We have affidavits from five, Your Honor. Without an evidentiary hearing, we don't know what others may have been affected. I thought it was your client who submitted an affidavit and he alluded to five family members being excluded, not the five persons who put in the affidavits. Is that is that right? Your Honor, I think we can reliably only say that in Mr. Lee's four relatives, they all said they weren't allowed in. And Mr. Patton's relative in his affidavit said he wasn't allowed in. I don't I don't think we can ascribe any more sweeping statements to that. All right. But certainly those five people were claiming that they were excluded. The unfortunate thing about this case is that counsel wasn't appointed on the 2255 in the district court because counsel would never have allowed such murky affidavits to be drafted in the first place. And some districts solve that problem by the District of Massachusetts, where I've spent a great deal of my career before moving here. For instance, the clerks would screen these applications, habeas applications ahead of time and would assign counsel to those that appear to have some arguable merit. But instead, we wind up with these cases where counsel is stuck with the record, however murky or incomplete it may be, prepared by pro se defendants. Of course, we have to be tolerant of those, as the court has pointed out many times in the past, give them a great deal of leeway. But it would be more helpful had we had a better record to begin with. I would submit to the court, though, that the the moving the jury out of public view and not the jury, the the proceedings out of public view into the jury room is by itself a very, very serious problem. I think it would read nothing into into counsel's failure to object and say that's a waiver. We don't even know that counsel knew what was going on, that they've been recognized there as a public trial. Well, I mean, he is a member of the bar and he is expected to have a certain basic knowledge of what is expected of him and what his duties to his clients are in a proceeding like this. Well, that's certainly the ideal, Your Honor. The the problem is that not everybody is so comfortable. He didn't know what was going on. You're talking about. As far as the existence of people from the courtroom or on on the individual voir dire. Well, both. There's no evidence that I'm aware of that counsel knew that the marshals were keeping people out of the courtroom or that they already know. You're saying maybe he didn't know. I think they probably didn't. All right. Now, if he didn't know, why should we assume that the judge knew? We don't have to assume the judge. Well, so then we get back to Judge Greenaway's question, is there you don't think there's a difference if the judge knew or didn't know that people were being excluded? How can you hold them to a, you know, a standard that, you know, he has no awareness of the facts? Well, you're out of these, you know, judge walks in the courtroom, the courtroom is full. And if he doesn't know people are being excluded, how can there be error on his part? Well, your honor, the error is the constitutional deprivation is the Seventh Circuit said in Walton versus Freilich. Well, that's the question, though. Is there a constitutional deprivation if the judge or the court does not take part? Of course there is. Well, if the courtroom is full, they aren't going to let more people in anyway, right? Well, that's not a constitutional right to overload the courtroom. If the courtroom is full, there's not a constitutional right to have family members come in, at least at this stage of the proceeding. Well, that's true, your honor. But the record is confused about how many people were there and what the capacity was at the given time and so on. There are ways to deal with that that weren't approached here. The court could have brought fewer people at a time into the courtroom for voir dire, what have you. If the court knew about it. Sorry, your honor. But the question is, suppose the court did not know about it. As the Seventh Circuit said in Walton versus Freilich, that is constitutionally irrelevant what the court knew or didn't know. What is important, what is critical is what happened. Was the public trial right denied? If it was, then we have a violation. We have to deal with it. It doesn't matter whether the court knew about it or didn't know about it. Otherwise we could expand this into probably all kinds of rights. If there was some kind of public demonstration on the street that kept people from coming to the courthouse, you know, and the judge should know about that, that amounts to a Sixth Amendment violation? Well, I think it has to be something that happens within the court because of the court, but the marshals are officers of the court. He's responsible for what happened in the courthouse, but not outside the courthouse. Well, your honor, I mean, we could expand this to thunderstorms and earthquakes if we wanted to. I mean, I mean, you know, uh, uh, you know, you, you, you, there seems to be some difference whether the judge knew or not, and now, and now you're talking about the circumstances under which the judge didn't know. Well, here we have allegedly the court officers, the marshals are deliberately excluding people from the courtroom. We're not letting them in. Why should it matter whether the judge ordered that or whether the judge knew or didn't know about it? They didn't let them in. So there was no public trial going on. That's what we have to be concerned about. If we can make this, the judge didn't know about it rule work, uh, to make this palatable, where's the public trial right going to go? It's going to go nowhere. It's going to disappear. Um, thank you, your honor. Well, I, I have one last question. So I, I presume that your point on judge, um, Roth's question about what happens when the, uh, judge comes out in the court, the entire courtroom is full of people and they're not aware of, you know, who's family and who's not that even if that were a, um, proper excuse, if you will, at one point in time, that doesn't continue throughout the process. Well, that's true. And Waller gives us a procedure of four things that have to be satisfied in order to, uh, have a closure of that kind. One of them has to be an overriding interest. The judge has to consider reasonable alternatives and so on. None of that was done here. It's the court just didn't have any interest in anything except taking the jury back in the jury room, uh, and getting them, uh, you know, getting a nice, comfortable, convenient setting. Convenience is not one of the reasons under Waller for doing it. Uh, as I say there, uh, I've seen judges many times, you've got an important case, say, well, they got a lot of publicity, what have you, you want to be very careful with Waddeer, you bring them up 25 at a time instead of 60 at a time, there are ways to handle that. All right. Thank you very much. Thank you, Your Honor. Going to Mr. Cocos. Yes. Yes, Your Honor. May it please the court, Donovan Cocos on behalf of the United States. I think the first issue the court should reach is whether Presley is retroactive to cases on collateral review at all. Um, I acknowledge there is a not so robust circuit split on this. The Ninth Circuit in Withers appears to have assumed that it is retroactive as has the First Circuit in Bucci. I think Fifth Circuit in, uh, Edelkin has assumed that it is not retroactive. Um, if you read Presley, I'll concede at the outset, it's an interesting opinion because the court decided it without argument and said, this is well settled by our prior case law. Now, what Presley doesn't say is that the rule it's announcing, which is that the Sixth Amendment right to a public trial extends to Waddeer, it doesn't say that it's retroactive to cases on collateral review, it doesn't say that it's an old rule for Teague purposes, nothing like that, and the reason I think that matters is when you look at the dissent, you have the dissenters saying reasonable jurists can, could, and did disagree as to whether the right to a public trial extended to Waddeer before Presley. Um, we know from Teague that a rule is only an old rule if the result was dictated by precedent. But a rule under, uh, I think it's Williams versus Taylor, the Supreme Court case from 2000 says a rule is not dictated by precedent unless all reasonable jurists would have found it to be obvious. Well, you have a dissent here saying here are some reasonable jurists who didn't think it was so obvious. They cite a bunch of cases. They cite Justice Stevens's concurrence from Press Enterprise, where he said today, we're not deciding the Sixth Amendment right to a public trial extends to Waddeer, so the government's contention is that it's not retroactive at all. Assuming that the court does determine that it's retroactive, and I would urge it to, even if, if, even if it agrees with me that it's not retroactive, I'd urge the court to reach the merits because of the circuit split, we all know how interested the Supreme Court can get in that kind of thing. So it'd be nice to have another basis for the opinion to stand. If the court does agree, does not agree that it, it isn't retroactive. So if it applies it retroactively, then Patten and Lee have to show two things. They have to show that there was an underlying Sixth Amendment violation of the right to a public trial, because we know from Thomas V Horn, the 2009 case from this court, that unless there's an underlying violation, counsel cannot have been ineffective for failing to raise it. And then if there was a violation, they have to show that no reasonable, competent counsel would have failed to object in these circumstances. And, and that's Thomas V Barner, which I cited in my brief. Here, they cannot demonstrate that there was a violation because the court looked at this transcript and saw absolutely no contemporaneous evidence that there was a closure at any time. That's kind of the fallacy of them saying. Let me challenge you on that for a moment. Yes, sir. It seemed to me that what the judge said was, you know, this is my common practice, you know, I don't recall the closure. In reading the opinion, I didn't see a finding, you know, I, you know, this either did happen or this didn't happen. I mean, it, it seemed equivocal to me. It, arguably, I think you could possibly read it that way, Your Honor. Here's one thing to keep in mind, though. She's writing this six years after the fact, seven years after the fact. She looked at this, and at one point, I think pages 13 and 14 of Mr. Lee's appendix, she says, there, there's no evidence a closure occurred at all in the transcript, and no evidence that if one did occur, that I knew about it. Now, I think it'd be disingenuous for the district judge to say, there's no evidence I knew about it, if she thought she ever knew about any closure in this case. So, that's how I get there. Now, he, they haven't really disputed that, because I don't know what they can do about it, but they haven't disputed the district court's finding, or at least characterization of the record, that no closure is apparent. And if that, if, if one. I, I don't understand. What do you mean they, they haven't disputed it? They put in these affidavits. Well, they've said that their family was out of the courtroom, but that isn't, that's not the same thing as saying the public was foreclosed from entering the courtroom, courtroom. I recognize that. Mr, Mr. Patton says, I have five family members who were there for support, who sought to get in, who didn't. Mr. Lee said, same thing happened, except, you know, he submits five family member affidavits. Each of which is not long on facts, immediately, of course, but each of which says, I attempted to get in, and for the entirety of the voir dire process, I was not permitted in.  Well, two things about that, Your Honor. First of all, taking all of that is true. Let's, let's say that happened. First of all, we don't know that the public generally was foreclosed from entering the court, courtroom. For all we know, they're trying to come in when there are 96 people in the courtroom, and it only holds 30 something in the spectator gallery. That's one. Yeah, but we know that that's not true for the entirety of voir dire, right? Correct, at least during the morning session. And that's why I, in page 19. But they, but they've said that they were kept out for the entirety of it. Right. And I. Morning and afternoon. And I assume that. Okay, but for the, as far as the court's concerned, it never ordered a closure. It never became aware of one if it was happening, if it was being caused by a marshal or CSO. But all the court is saying is, this was a long time ago. I don't remember, this is my usual practice. But. You know, that's a far cry from, it didn't happen. I mean, we do that with witnesses all the time. You do it with witnesses all the time. Right, right. But, Your Honor, I, and I, and I appreciate that. I guess the, the distinction here, though, is, their theory was that she had ordered the closure off the record. They, they, they sort of recognize there's no record evidence that she ever ordered a closure, so they theorize she ordered it off the record. She said, I never do that. So that forecloses that. And then she said, as far as her knowledge of, of, of a closure ever happening, she said there's no record evidence that I ever knew of it. And I take that to mean. So without her imprimatur, you see no structural error? I, yeah, I see no closure of any kind without, and, and this court's post-Pressly case is unpublished. It seemed to accept that, but they cite, I think, Peterson and other cases, but for the proposition, the court has to know. Now, I appreciate they're citing a Seventh Circuit case for the proposition that the intent or inadvertence does not matter. But that formulation of the issue all tracks back to the court. It's the court's intent. It's the court's inadvertence. There, a reasonable counsel, even if you apply Pressley retroactively, I don't think would have thought that a closure caused by something totally outside the court's knowledge would amount to a Sixth Amendment violation. And in this case- Well, but suppose it matters, it concerns matters about court operation that the court delegates, delegates to other persons, such as to the US Marshal. Then doesn't the court bear some responsibility? I mean, it's a matter of policy of the court, isn't it? Yes, we're gonna delegate to the US Marshal, you know, all decisions on, you know, who could come into the courthouse. I suppose so, but there's no evidence anything like that happened here. Well, then you think we need an evidentiary hearing? I don't think so, Your Honor, because I think the problem becomes, you have the court saying, I didn't know of a closure, there's no evidence in the record that a closure occurred. That to me is critical. If you allowed a hearing in this case, every case is gonna look pretty much like this, unless you have a court- When you say there's no evidence that a closure occurred, there is evidence, as Judge Greenaway has mentioned several times, that a number of people were excluded from the courtroom. There's, but no- Some were told, you know, some were told why they were excluded. There's no contemporaneous evidence, I guess I should say. When you read the transcript, which is what appellate counsel would have had access to, because there's no allegation, they even told their appellate counsel about this. When you read the transcript, there's no evidence of a closure. When you, when, and that's what the district court did. She relied in part on her recollection. And again, it's six, seven, now eight years after the fact, it's just not fair to us and the court to expect us to come forward with evidence to prove this negative. And in this case, you have in the record, at one point in the transcript, the district court seeing the courtroom getting full and saying, we get everybody in. That to me is not a closure, that's an invitation. No one says otherwise. On top of that, I mean, so they can't even make it past that first hurdle, but then you have the issue of any closure was either partial or trivial. And that's where we get to the breakdown, the morning session, I think Mr. Patton sees. Could we talk about triviality specifically for a moment? When you look at most of the cases, obviously, the second circuit has a couple and other circuits as well. The analysis under triviality seems to be one, two people. I mean, if the entirety of the exclusion were just the ten people referenced in the two affidavits, you'd have to admit that that's way beyond anything that's been discussed in any of the cases, right? Because the cases are, and probably rightfully so, if one person gets excluded, you can make the triviality argument. But when you're up to ten, doesn't it not make sense in that context? Well, Your Honor, it's our theory there was no closure at all in the morning, because Mr. Patton saw more people in the courtroom than could be explained by the voir dire. The district court noted that at footnote five of the patent order, and they haven't been able to show that that was a clearly erroneous interpretation of the evidence that they've offered. So that's one problem. And so for the afternoon session, I agree with you, assume no one's in the courtroom except the veneer. Then what happens is, would the proceeding have been meaningful to anyone sitting in the courtroom? And we have Gupta and Gibbons and Morales saying, this is essentially one big sidebar. So even if you conducted it in front of the people in the courtroom, they wouldn't hear what was happening. But doesn't that vitiate the entire notion of the public trial? Because either the result of us following that line would be, every district judge everywhere will just hold everything at sidebar. And now the appellate courts have ridded themselves of another appellate issue. Because no one will ever be able to bring up a public trial issue, because everything's done at sidebar now. So there's never gonna be a problem. Well, I mean, I don't know that we see, I would see a court going down that road. I mean, courts traditionally have held the individual voir dires at least at sidebar. If not, often jury rooms to give the prospective jurors some privacy and confessing things like bias, everything else. Are we bound by Bonsall? I think so. I mean, it's this published Third Circuit opinion that says this isn't the- Well, but they're the different procedural stance in that case. It is, but I mean, I think that came up on plain air review. Remember, this is encapsulated with an ineffective assistance claim. So the cause and prejudice standard under Frady requires them to show even more. I think at least for the principle that this doesn't violate the Sixth Amendment, per se, I think at least Bonsall can be cited for that. And then Gupta, Morales, Gibbons all say it's trivial anyway. Well, distinguish it from Owens, though. I mean, Owens seems to take some of that reasoning and say, you know what, we're not going to adopt that, and we have a different view. Right, well, in Owens, you have the court actually knew the closure was happening, for one thing. Some of it I have a hard time distinguishing from Owens in the sense that Owens rejects so many of the basic principles that this court's post-Presley cases have already accepted. I mean, if the court's going to jettison those and go with Owens, there's not much I can say other than that involved a closure that the courtroom was aware of, and here it just didn't. The other issue that they have to overcome is that they have to show, even if there was a Sixth Amendment violation, so say there's a closure, the court was aware of it or ordered it, and it was total or at least meaningful.  And let's ask ourselves, I mean, I've identified a few strategies that it's clear from the record they have. One is, they say they told their own counsel, hey, our families are outside, and both their counsel said, in effect, yeah, the courtroom's too full. Well, if they thought the courtroom was too full, that's not a Sixth Amendment violation. We know that from Cobley, Gibbons, even Shryock in the Ninth Circuit. The other thing is, counsel are looking at a court reporter. They know it's all being transcribed. This court has said in the LaNue case, LNU, Smith, even Antar, which I think Judge Roth authored, that the access to public transcripts afterwards can help preserve the right to a public trial. You also have counsel who know that this proceeding is gonna be taking place most of the afternoon out of sight of the public anyway. They rationally could have concluded it wouldn't be worth the fight to kick up a fuss about getting the family in the courtroom for what would have amounted to 75 minutes in the morning, where they see jurors reading off numbers on questionnaires. And finally, I mean, I think there was an issue that counsel were worried about, which is they were worried about getting a jury that was not gonna be biased against the defense based on the race. That's why we have like a Batson challenge that was in the offing and eventually abandoned. One of them even say, their counsel said to me, this isn't that important because no testimony's gonna be taken. We could agree or disagree with our assessment of that, but can we really say no competent counsel would have thought so? So for all of those reasons, they can't demonstrate an underlying systematic violation or that counsel was ineffective. Now on the prejudice issue, I know they've sort of said, well, we assume prejudice on a structural error. I'll concede there's a circuit split on that. And Your Honor, Judge Tashima, I read your dissent in Carrera last October, so I know I may be in the rough with you on this one. But I think the Supreme Court in all of its post-Strickland cases has never said that we assume prejudice from a counsel error, unless the counsel error's in the nature of there's a complete denial of counsel or a conflict of interest of counsel. It's Wright versus Van Patten, Bell versus Cone, Florida versus Nixon, Mickens v. Taylor, Smith v. Robbins, Penson versus Ohio, Rowe versus Flores-Ortega, and also Chronic and Strickland. Those are all those cases that talk about this. Never once has prejudice been presumed just from an underlying Strickland error. So hopefully the court doesn't have to reach that issue if it agrees with me that there's no counsel ineffectiveness. But if it does, it should know there's a circuit split. And in the Withers case, Justice, Judge Pragerson, I clerked for him once and I've elevated him in my own mind. Judge Pragerson broke down the split. I'm sure he's happy about that. Yeah, they broke down the split pretty well. The last thing I would like to mention is, as to this whole issue about a hearing, please keep in mind this court's post-Pressley precedence, the cases in the Virgin Islands, I think, did involve a hearing. But that was because, number one, there was no way the court could have known, I mean, the court was off the bench, so it didn't know what happened. And number two, most critically in my mind, that was on a Rule 33 motion that was brought within weeks or two months of the trial. Here we have parties coming in, six, seven, eight years later. It just isn't fair to us to expect anything to come out of a hearing. I don't know if we could find out who was in charge of the CSOs or the marshals in the courtroom that morning. Anyway, I see, I've got the red light, so. Should that really be a consideration of ours, who's left? I mean, if this were purely a issue where the remedy would be a new trial on the merits, right? I mean, the fact that witnesses may have died or it would be more difficult for the government, I mean, that's really not a consideration. I guess it's, I would call it a crass, pragmatic consideration, in the sense that we just will not be able to rebut. Their family can come forward and say, yes, we were denied entry that day. But the court has said, I don't recall this, if it happened, there's no evidence I ever knew of it, what are we ever going to be able to rebut that with, six years later, seven years later? So that's all I mean by that. I don't know that it's a dispositive consideration, but it's one I think it's important when you're a court asking yourself, should I conduct a hearing on this? Thank you very much. Thank you. May it please the court. I think to address a number of questions of the panel and of my learned friend from the government, what I'd like you to imagine is, imagine a clerk, a judge's clerk, during jury deliberations goes in without the judge's knowledge and says, hey jury, there was some evidence that you didn't get that shows that this person's guilty. And I think you really, really should find guilty and tell us about this evidence. Judge doesn't know about it, years pass, it's a guilty verdict. We never find out about it. And then finally, the clerk comes out and says, years later, I did this. The judge had no knowledge, couldn't control it, but it happened. And we would have serious misgivings about the outcome of that trial, even though it happened such a long time ago. And so, while I think we can understand how difficult it might be for a judge to know what happened seven years ago, and it might be difficult in a certain sense to keep a judge on the hook for all the things that happen in a courtroom. When we're talking about something, about the sanctity of a public trial right, we can say that there's been a violation, even if it was from courtroom staff. That's, I guess, what I was trying to show you through that example. I'm hoping you imagine that there can be errors that would seriously undermine our confidence in the fairness and integrity of a trial, where the judge has done essentially nothing wrong. I hope the clerk was fired in that sort of example. A little late for that. Yes, I guess it's also true. But the problem here is that that still creates, there's still the public harm of having a guilty verdict that has this taint to it. And what we can do is go back and have a hearing about it. Just because something is difficult or it may be hard for a court, doesn't mean that we shouldn't do it. I guess the second point I wanted to make was about Bonsall, which is that he didn't complain at trial. That was the finding, and there's no evidence of it. Here we have an affidavit that said, I tried to raise this with my lawyer, and he didn't do anything about it. So the case is at least distinguishable in the sense that Bonsall wanted to make sure, at least police, the strategic use of the rules to sort of spring it on the court. Here we don't have that. You can write an opinion that doesn't encourage that, because here, there would be a showing that, hey, I'm Mr. Lee. I tried to raise this with my trial counsel. I was unable to. Let me ask you a question. Sure. About the relief you seek, right? So in a perfect world. Yes. Right now, it's about as perfect as it's gonna get in my hypothetical. But in a perfect world, you would be granted the writ, and a hearing would be ordered. Correct. The hearing's held. Yes. Judge makes whatever conclusions she makes. Mm-hm. Assume for a moment she says, no Sixth Amendment violation. Then that's the end of the process. And she enters some sort of, she denies a certificate of appealability. Right. Which, obviously, you'd come back. Yes. We would be back here, because we're very confident that the evidence will show that this was ineffective. There's no strategic reason. This is a really serious violation. It's a home run winner at trial and appeal. What about the fact that Mr. Koch has, or the argument he made, I should say, that both counsel appears, or at least aware, and just strategically came to the conclusion, you know what? I'm not going to make a fuss about this for whatever reason. We don't play fast and loose with those sorts of rights. You can't, the Supreme Court has put the public trial right up there with the right to a jury trial, the right to be represented by counsel. And so there can't really be a strategic reason, we would argue, to waive that right, or at least infer from counsel's conduct that they can waive it on behalf of the client. When there's a guilty plea, when you go pro se, you go through all sorts of paperwork and waivers saying, do you really want this? Do you really want this? And then we allow the court to go forward. So I think there's a difference here when, even if you wanted to infer some sort of strategic purpose, you're not going to find it in this record, at least to the extent that we normally ask when we're talking about rights like this. All right, thank you. Thank you. All right, thanks to all counsel. This case was excellently argued, and we will take it under advisement. Thank you very much.